1  Jordan L. Lurie (SBN 130013)
   Jordan.Lurie@capstonelawyers.com
2  David L. Cheng (SBN 240926)
   David.Cheng@capstonelawyers.com
3  Tarek H. Zohdy (SBN 247775)
   Tarek.Zohdy@capstonelawyers.com
4  Cody R. Padgett (SBN 275553)
   Cody.Padgett@capstonelawyers.com
5  Sharon Yaacobi (SBN 280760)
   Sharon.Yaacobi@capstonelawyers.com
6  Capstone Law APC
   1840 Century Park East, Suite 450
7  Los Angeles, California 90067
   Telephone:    (310) 556-4811
8  Facsimile:    (310) 943-0396

9  Attorneys for Plaintiff Chris Aguilar

10

11                 UNITED STATES DISTRICT COURT

12                 EASTERN DISTRICT OF CALIFORNIA

13

| CHRIS AGUILAR, individually, and on behalf of a class of similarly situated individuals, | Case No.:  CV 13-00437-LJO-GSA |
|---|---|
| Plaintiff, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| v. | (1)  Violations of California Consumer Legal Remedies Act |
| GENERAL MOTORS LLC, a Delaware Limited Liability Company; GENERAL MOTORS COMPANY, a Delaware Corporation, | (2)  Violations of Unfair Business Practices Act<br>(3)  Breach of Implied Warranty pursuant to Song-Beverly Consumer Warranty Act<br>(4)  Violation of the Magnuson-Moss Warranty Act |
| Defendants. | (5)  Breach of Express Warranty pursuant to Cal. Comm. Code § 2313 |
| | **Jury Trial Demanded As to All Claims So Triable** |

1.      Plaintiff Chris Aguilar ("Plaintiff") brings this action for himself and on behalf all persons in the United States who purchased or leased any 2009 through 2012 GMC Acadia, 2009 through 2012 Buick Enclave, or 2009 through 2012 Chevrolet Traverse vehicles (collectively, "Class Vehicles")[1] designed, manufactured marketed, distributed, sold, warranted and serviced by General Motors, LLC and General Motors Company (collectively, "General Motors" or "GM").  Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

### NATURE OF THE CASE & COMMON ALLEGATIONS OF FACT

2.      This action arises out of a uniform and widespread defect in the integral steering system of an entire class of automobiles that poses an extremely unreasonable safety risk not only to the driver and passengers of the vehicle, but to other drivers on the road and pedestrians on the street.

3.      Upon information and belief, the Class Vehicles' steering system is defective because steering may intermittently and drastically fail while the car is in motion (the "Steering Defect"), thus creating a serious safety risk.

4.      An automobile's ability to respond to driver input is one of the most critical components of vehicle control, stability and safety.  The steering wheel is the driver's sole source of maneuvering and directing the vehicle based on driver input.  Modern automobiles can travel at speeds in excess of 80 miles per hour on roads and highways filled with other automobiles travelling at similar speeds.   Precise and calibrated control of the nearly 5,000 pound automobile that hurtles down roads is an essential safety function.  A fully functional, responsive steering system is an integral component of a safe automobile.

5.      The GMC Acadia, Chevrolet Traverse and Buick Enclave make up the Lambda crossover platform.  All three vehicles employ the same common design and interchangeable

---

[1] The proposed Class Vehicles include only vehicles manufactured and sold after July 10, 2009, the date of the closing of the bankruptcy styled *In re General Motors Corp. et al*, administered in the United States Bankruptcy Court for the Southern District of New York. *See In re General Motors Corp,* Case No. 09-50026 (Bankr. S.D.N.Y. July 5, 2009).

1  components that include the GM designed and manufactured LLT 3.6 liter gasoline direct

2  injected engine, a six speed 6T75 transmission and common suspension system.  Most

3  significantly, the Lambda platform also shares the same steering system.

4      6.      The Class Vehicles steering system is composed of a rack and pinion, steering

5  column, steering gear, steering gear bushings, power steering pump, and steering wheel.  The

6  generic illustration below shows a steering system (not configured precisely as the Class

7  Vehicles' steering system).



20      7.      As a result of the defect in the Class Vehicles' steering system, consumers will

21  be required to pay hundreds, if not thousands, of dollars to replace the steering wheel, steering

22  column, rack and pinion, steering pump, steering gear, steering gear bushings, grommet,

23  and/or other steering related components.

24      8.      In addition to these monetary costs, the Class Vehicles and their power steering

25  system present a safety hazard and are unreasonably dangerous to consumers.  The steering

26  system is one of the most important mechanical components for vehicle control and safe

27  driving.  A defective steering system can have serious consequences on the handling,

28  maneuvering and stability of Class Vehicles while in operation, thereby contributing to car

1   accidents, which can cause personal injury or death.

2       9.    Plaintiff is informed and believes, and based thereon alleges, that prior to sale

3   of the Class Vehicles, Defendants knew that the Class Vehicles and their steering system were

4   defective and not fit for their intended purpose of providing consumers with safe and reliable

5   transportation.  Nevertheless, Defendants have actively concealed and failed to disclose this

6   defect to Plaintiff and Class Members at the time of purchase or lease and thereafter.

7       10.    In brochures for the Acadia line of vehicles, GM advertised that their vehicles

8   employ "power rack-and-pinion steering" for "precise and accurate response" to driver input

9   and "positive on-center feel at highway speeds, as well as extra low-speed assist for

10   maneuvering in tight spaces."

11       11.    Class Vehicle owners in surprising numbers have reported multiple episodes of

12   the Steering Defect to their dealers and to the National Highway Traffic Safety Administration

13   ("NHTSA").  Below is a typical example:

14       THE CONTACT OWNS A 2010 GMC ACADIA. WHILE
     DRIVING APPROXIMATELY 60 MPH THE STEERING

15   WHEEL LOCKED AND THE WOULD NOT TURN TO THE
     LEFT OR RIGHT. THE CONTACT APPLIED EXCESSIVE

16   FORCE TO THE STEERING WHEEL IN ORDER TO
     MANEUVER THE VEHICLE. THE VEHICLE WAS TAKEN

17   TO THE DEALER WHERE THE TECHNICIANS REPLACED
     THE STEERING PUMP. THE FAILURE OCCURRED THREE

18   TIMES AND WAS TAKEN TO THE DEALER. THE
     TECHNICIANS REPLACED THE STEERING PUMP, PIPE

19   AND GASKETS. THE VEHICLE WAS NOT TAKEN TO THE
     DEALER FOR DIAGNOSTICS A THIRD TIME. THE

20   VEHICLE WAS NOT REPAIRED. THE APPROXIMATE
     FAILURE MILEAGE WAS 30,000.

21

22       12.    Each class vehicle is sold with a 3 year/ 36,000 mile basic bump-to-bumper[2]

23   and a 5 year/ 100,000 mile "Drivetrain" written express warranty, wherein GM affirmatively

24   promised to repair defects in the Class Vehicles during the prescribed period at no cost to the

25   owner.

26       13.    Plaintiff is informed and believes, and based thereon alleges, that even where

27   Defendants agree to address consumer complaints of power steering being nonresponsive

28       [2] The Buick Enclave comes with a 4 year/ 50,000 mile bumper-to-bumper warranty.

and/or completely failing, Defendants merely replace the defective rack and pinion, power steering pump, bushings,  and/or steering gear with the same defective components.

14.     Plaintiff is informed and believes, and based thereon alleges, that the repairs are a temporary mask that will last only long enough to ensure that the Steering Defect manifests outside of the Class Vehicles' express warranty period.  Ultimately, this leaves consumers with defective vehicles that are substantially certain to again experience the Steering Defect and costly repairs, as well as the associated safety hazards.

15.     Plaintiff is also informed and believes, and based thereon alleges, that Defendants are aware that attempting to repair the Steering Defect by replacing the defective steering components with the same defective components does not fix the Steering Defect. Rather, Defendants implemented this temporary fix to ensure that the Steering Defect occurs outside of the warranty period so that Defendants can unfairly shift financial responsibility for the Steering Defect to Class Members.

16.     Plaintiff is informed and believes, and based thereon alleges, that despite notice of the defect from numerous consumer complaints and dealership repair orders, Defendants have not recalled the Class Vehicles to repair the defects, have not offered their customers a suitable repair or replacement free of charge, and have not offered to reimburse the Class Vehicles' owners and leaseholders in full for the costs they incurred in diagnosing and repairing the Steering Defect.

17.     As a result of their reliance on Defendants' omissions and/or misrepresentations, owners and/or lessees of the Class Vehicles have suffered an ascertainable loss of money, property, and/or value to their Class Vehicles.

18.     As a result of Defendants' misconduct, Plaintiff and Class Members have been harmed and have suffered actual damages in that their steering systems experience continuous and progressive problems, and have failed and will continue to fail before their expected useful life has run.

19.     As a result of Defendants' misconduct, Plaintiff and other Class Members have suffered injury in fact, and have lost money or property.

**PARTIES**

**Plaintiff Chris Aguilar**

20.     Plaintiff CHRIS AGUILAR is a California citizen who resides in Fresno, California.  On or around May 7, 2010, Mr. Aguilar financed and purchased a 2010 Chevrolet Traverse from Hedrick Chevrolet, an authorized Chevrolet dealer in Clovis, California.  The vehicle was manufactured, sold, distributed, advertised, marketed, and warranted by Defendants, and bears the Vehicle Identification Number 1GNLRGED1AS136805.  The vehicle bears a production date of 10/2009.

21.     A determining factor in the purchase of his vehicle was passenger safety, including the safety of his grandchildren, of whom he planned to transport.  Mr. Aguilar took time and care to research the Chevrolet Traverse and asked the dealership questions regarding the safety of the vehicle for the driver and passengers.

22.     Prior to the purchase, Mr. Aguilar reviewed advertising and dealership brochures concerning the 2010 Chevrolet Traverse.  Moreover, Mr. Aguilar remembers viewing television commercials touting the characteristics of the 2010 Chevrolet Traverse.  Mr. Aguilar relied on these brochures and advertisements and they were instrumental in his purchase of the Chevrolet Traverse.

23.     Mr. Aguilar purchased this vehicle primarily for his personal, family, or household purposes.

24.     After experiencing vibrations within the steering wheel during the normal course of driving, in or around August 24, 2010, at approximately 8,935 miles, Mr. Aguilar took his vehicle to Hedrick Chevrolet, the same dealership from where he purchased it, complaining of loud noises originating from the steering wheel and general instability in the steering column.  The dealer confirmed Mr. Aguilar's complaints and replaced the CV Joint and accompanying boot, assuming that to be the issue.

25.     Within two months, Mr. Aguilar began to experience the same noises originating from the steering system.  Believing the dealership to be the issue, Mr. Aguilar took his 2010 Chevrolet Traverse to a different Chevrolet dealership, Michael Automotive

Center of Fresno, California, in or around October 14, 2010, at approximately 11,217 miles. The mechanics at Chevrolet denied hearing the noise, yet still replaced the intermediate steering shaft, part description "SHAFT 6.526" on his repair order.

26.    Less than two weeks later, on or around October 27, 2010, at approximately 11,796 miles, Mr. Aguilar began to experience the same noises emanating from the steering column and again took his vehicle back to Michael Automotive Center of Fresno, California. The dealer again confirmed Mr. Aguilar's complaints and replaced the rack gear, part description "GEAR 6.508" on his repair order, and told him the noise should disappear in time.  However, the noise continued.

27.    In or around December 22, 2011, at approximately 30,489 miles, Plaintiff took his vehicle back to Michael Automotive Center.  Mr. Aguilar complained of, according to his repair order, a "Loud whinning (sic) noise that seems to be coming from power steering and has been occurring since when we replaced steering gear and told customer noise should go away when driving."  Additionally, the repair order goes on to state the "vehicle is pulling to the left when driving and will cause steering wheel to hesitate when turning."  The mechanics at Michael Automotive Center replaced the power steering pump, part description "Pump 6.605", and the power steering gear assembly, part description "Gear 6.508."

28.    Currently, Mr. Aguilar's 2010 Chevrolet Traverse continues to have steering issues related to the Steering Defect, including loss of power steering, hard steering, forceful pulling to the left and right, and loss of steering control, as if the front end of the vehicle is floating or gliding while driving.  These steering issues continue despite numerous repair attempts.

29.    Safe and reliable steering is and always has been an important factor for Mr. Aguilar.  Had GM informed him of the Steering Defect before purchase, he would not have purchased the subject vehicle or would have paid less for it.

30.    At all times, Mr. Aguilar has driven his vehicle in a foreseeable manner and in the manner in which it was intended to be used.

///

**Defendants**

31.     Defendants General Motors LLC and General Motors Company are automobile design, manufacturing, distribution, and/or servicing companies doing business in all 50 states.  Defendants design, manufacture, distribute, market, service, repair, sell and lease passenger vehicles, including the Class Vehicles, nationwide.

32.     Defendant General Motors LLC is a Delaware limited liability company registered to do business in the State of California and has a principal place of business at 300 Renaissance Center, Detroit, Michigan 48265. General Motors Company is the parent and owns 100% of General Motors LLC.

33.     Defendant General Motors Company is a corporation organized and in existence under the laws of the State of Michigan and registered with the Michigan Department of Corporations.  General Motors Company Corporate Headquarters are located at Dearborn, Michigan.

34.     Defendant General Motors Company was formed by the United States Department of the Treasury in 2009 and on July 10, 2009, acquired and assumed substantially all of the assets and liabilities of General Motor Corporation.[3]

35.     Upon information and belief, General Motors Company is the continuation of General Motors Corporation after the latter filed bankruptcy in 2009, as evidenced by the fact that Board Members for General Motor Company, Errol B. Davis, Jr., E. Neville Isdell, Kent Kersa, Phillip A. Laskawy, and Kathryn V. Marinell, continued as Board Members for General Motor Corporation.

36.     At all relevant times, Defendants were engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and other motor vehicles and motor vehicle components in Fresno County and throughout the United States of America.

///

///

----

[3] General Motors Company, Annual Report (Form 10-K), at 1 (Mar. 15, 2010).

**JURISDICTION AND VENUE**

37.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), the "Class Action Fairness Act of 2005," because this case is filed as a class action under Federal Rule of Civil Procedure 23, the aggregate amount in controversy for the entire class exceeds $5,000,000, exclusive of interest and costs, and a substantial number of putative class members are citizens of states different from Delaware and Michigan.  Thousands of putative class members are California residents.

38.     Venue is proper in this district and division under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district.  Defendants market and sell the Class Vehicles across the United States and in this judicial district.

39.     In addition, a substantial part of the events or omissions giving rise to these claims and a substantial part of the property that is the subject of this action are in this district. In addition, Plaintiff's Declaration, as required under California Civil Code section 1780(d) but not pursuant to *Erie* and federal procedural rules, which reflects that a substantial part of the events or omissions giving rise to the claims alleged herein occurred, or a substantial part of property that is the subject of this action, is situated in Fresno, California, is attached as Exhibit A.

40.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a).

**FACTUAL ALLEGATIONS**

41.     For years, Defendants have designed, manufactured, distributed, sold, and leased the Class Vehicles.  Defendants have sold, directly or indirectly, through dealers and other retail outlets, thousands of Class Vehicles equipped with the defective steering systems in California and Nationwide.

42.     The steering system, equipped in all Class Vehicles, include the steering wheel, steering column, rack and pinion, steering pump, steering gear, steering gear bushings, and grommet.  Maneuvering the vehicle begins with the steering wheel, which is attached to the steering column.  From the steering column, the driver's rotational input from the steering

wheel is converted to linear motion through the rack and pinion.  The rack and pinion thereby controls the axles of the vehicle, thusly turning the vehicle to the direction based on driver input.  A power steering pump employs hydraulic pressure to force directional movement with less action required by the driver.  Clearly, the steering system is a very sophisticated system of interdependent components that are critical to the movement, direction and control of the vehicle.

43.     In 2009, Defendants began to bring Class Vehicles with the steering system installed to the market. Unfortunately, the steering system was plagued with numerous defects.

44.     Dating back to 2008, if not before, Defendants were aware of the defects of the steering system.  Defendants, however, failed and refused to disclose these known defects to consumers.  As a result of this failure, Plaintiff and Class Members have been damaged.

**The Steering Defect Poses An Unreasonable Safety Hazard**

45.     Class Vehicles have habitually suffered steering system failure while in traffic, creating very serious safety hazards.  These failures often result in the steering wheel locking, loss of power steering while in motion, knocking, bumping, or grinding noises while turning, steering wheel instability, and/or total steering wheel failure.

46.     Hundreds, if not thousands, of purchasers and lessees of the Class Vehicles have experienced problems with the steering system.  Complaints filed by consumers with the NHTSA and posted on the Internet demonstrate that the defect is widespread and dangerous, expensive to repair, and that it manifests without warning.  The complaints also indicate Defendants' awareness of the problems with the steering system, the costs associated with the necessary repairs, and how potentially dangerous the defective condition is for consumers. The following are some safety complaints relating to steering system failure (spelling and grammar mistakes remain as found in the original):

**NHTSA Complaints:**

(a)     [2009 GMC ACADIA] TL* THE CONTACT OWNS A 2009 GMC ACADIA. WHILE DRIVING APPROXIMATELY 5 MPH, THE CONTACT HEARD A SQUEAKING SOUND COMING FROM THE

STEERING. THE VEHICLE WAS TAKEN TO THE DEALER FOR DIAGNOSTICS. THE TECHNICIAN STATED TO THE CONTACT THAT THE RACK AND PINION WOULD HAVE TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE APPROXIMATE FAILURE MILEAGE WAS 43,000. UPDATED 02/01/12 *BF THE CONSUMER STATED THE PROBLEM HAS BECOME MORE INTENSE AND THE RUBBING NOISE IS MORE PRONOUNCED, THE STEERING WHEEL MADE A NOTICEABLE CLICK WHEN RETURNING TO NEUTRAL FROM BOTH THE LEFT AND THE RIGHT AT SLOW SPEEDS. THE CONSUMER STATED THE POWER STEERING PUMP HAS BEEN REPLACED THREE TIMES. THE CONSUMER ALSO STATED HE WOULD BE HAVING THE STEERING RACK AND PINION GEAR BOX REPLACED. UPDATED 02/08/12

(b)   2009 GMC ACADIA; STEERING RACK FAILURE. THIS IS THE THIRD FAILURE SINCE TAKING DELIVERY OF THE VEHICLE IN JANUARY 2009. DEALER WILL REPAIR UNDER WARRANTY HOWEVER, THE REPLACEMENT PARTS ARE CLEARLY NOT FIXING THE PROBLEM. POSSIBLE LOSS OF VEHICLE CONTROL WHEN THE RACK FAILS COMPLETELY AND SUDDENLY. MORE OFTEN, THE RACK WILL LEAK INTERNALLY GIVING OWNER "TIME" TO REPAIR. NHTSA NEEDS TO INVESTIGATE AS THE CARS AFFECTED ARE NUMEROUS. THEY INCLUDE THE ACADIA, THE SATURN OUTLOOK, BUICK ENCLAVE AND A SIMILAR CHEVROLET MODEL (LAMBDA CHASSIS) THAT UTILIZES THE SAME COMPONENT. ADDITIONALLY, WHAT HAPPENS TO CONSUMERS ONCE THE WARRANTY EXPIRES AND THE REPEATED FAILURE OCCURS ONCE AGAIN? THIS IS MY THIRD FAILURE IN ONLY 32,500 MILES. *TR

(c)   [2009 GMC ACADIA] WHEN TRYING TO STEER THE VEHICLE BELOW 5 MPH'S (ENGINE BELOW 1200 RPM), THE STEERING WHEEL WILL LOCK UP AND IS VERY HARD TO STEER. MY WIFE HAD THIS HAPPEN TO HER THE FIRST WHEN SHE WAS PULLING INTO OUR DRIVEWAY (THANKFULLY IT DID NOT HAPPEN IN THE CITY). SHE TOLD ME ABOUT IT, SO I THEN TOOK IT TO TOWN SHOPPING. IT TOOK A WHILE BEFORE IT HAPPENED TO ME, BUT FINALLY IT DID WHEN I WAS MAKING A TIGHT RIGHT HAND TURN INTO A MENARDS PARKING LOT. I STARTED THE TURN AND NOTICE INSTANTLY THAT I HAD NO STEERING. I ALMOST HIT ANOTHER CAR BECAUSE I WAS NOT ABLE TO STEER SHARP ENOUGH OR FAST ENOUGH FOR THE RIGHT HAND TURN. AFTER THAT, I GOT IN THE PARKING LOT AND DID A LITTLE TESTING. I FIGURED OUT THAT THE STEERING WAS LOCKED, AND IF THE ENGINE WAS REVVED OVER 1200 ENGINE RPM, THE STEERING WOULD COME BACK SLIGHTLY. AFTER SEVERAL TRIES, IT DID COME BACK. DON'T KNOW IF I CAN TRUST IT TO WORK ALL THE TIME??? IT APPEARS THE PROBLEM IS WORSE AFTER THE CAR HAS BEEN RUN FOR A WHILE. WITH COLD TEMPS IT WORKS UNTIL THE STEERING SYSTEM WARMS., THEN PROBLEM IS RANDOM. SCARY!!! FEELS LIKE THERE IS A FLOW CONTROL VALVE MAYBE

THAT IS IN PUMP, AND WHEN IT STICKS OPEN, THE STEERING IS LOST AT IDLE SPEEDS. NOT A GOOD DEAL... *TR

(d) [2009 GMC ACADIA] I WAS DRIVING SLOW AND WHEN I WENT TO TURN THE STEERING WAS EXTREMELY TIGHT. I HAD TOLD THE DEALERSHIP WHERE I BOUGHT IT FROM, FROM THE DATE OF PURCHASE THAT SOMETHING WAS WRONG. FINALLY TOOK IT IN ON 10/19/2012 AND WAS TOLD IT WAS THE POWERSTEERING PUMP. IT'S OVER $400 TO GET FIXED AND I DON'T HAVE IT RIGHT NOW. *TR

(e) [2009 GMC ACADIA] I HAD JUST PICKED UP MY CAR FROM HAVING THE A/C COMPRESSOR AND CONDENSOR REPLACED AND I WAS DOING A U TURN INTO A GAS STATION WHEN THE POWER STEERING WENT OUT. I HAD TO MANUALLY TURN THE WHEEL. WITH MY TWO CHILDREN IN THE BACK I ALMOST WENT INTO A DITCH. I IMMEDIATELY CALLED THE DEALERSHIP AND TOOK IT IN FOR THEM TO LOOK AT. THEY TOLD ME THAT THE POWER STEERING GEAR ASSEMBLY WAS LEAKING AND NEEDED TO BE REPLACED. THEY FOUND THAT WHEN THE VES VALVE WAS COMMANDED SHUT, THE VALVE WOULD NOT RE-OPEN. THE RACK WAS ALSO LEAKING ON THE LEFT SIDE. THEY REPLACED THE GEAR ASSEMBLY, SET TOE AND FLUSHED THE SYSTEM. THIS IS A SERIOUS SAFETY CONCERN AND SHOULD BE LOOKED INTO FOR A RECALL. *TR

(f) [2010 GMC ACADIA]   THE STEERING MAKES AN AWFUL NOISE WHEN TURNING. THIS IS USUALLY AT LOW SPEEDS. THIS SAME PROBLEM WAS CORRECTED WHILE IT WAS UNDER WARRANTY AT THE DEALERSHIP. HOWEVER, NOW I AM PAST THE MILEAGE WARRANTY AND NOTHING WILL BE DONE. I HAVE CONTACTED GMC SEVERAL TIMES AND THERE WERE NO SUGGESTIONS. THIS IS VERY DISAPPOINTING SEEING THAT IT HAS BEEN LESS THAN A YEAR SINCE THE PART WAS REPLACED UNDER WARRANTY. *TR

(g) TL* THE CONTACT OWNS A 2010 GMC ACADIA. WHILE DRIVING APPROXIMATELY 25 MPH, THE CONTACT SLIGHTLY TURNED THE STEERING WHEEL AND THERE WAS AN ABRUPT FORCEFUL RESPONSE. THE FAILURE OCCURRED WHILE DRIVING AT ANY SPEED. WHEN TURNING THE STEERING WHEEL, EXCESSIVE FORCE WAS REQUIRED TO PREVENT THE VEHICLE FROM WANDERING OFF THE ROAD OR INTO ANOTHER LANE. THE VEHICLE WAS TAKEN TO AN AUTHORIZED DEALER ON THREE DIFFERENT OCCASIONS FOR THE SAME FAILURE. THE TECHNICIAN STATED THAT THE VEHICLE PERFORMED WITHIN FACTORY SPECIFICATIONS. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 350. UPDATED 03/14/12*LJ THE CONSUMER STATED WHILE DRIVING, THE VEHICLE WOULD DRIFT IN EITHER DIRECTION. WHEN HE TRIED TO CORRECT IT, THE VEHICLE WOULD DIVE IN THE OPPOSITE DIRECTION.

(h)     [2012 GMC ACADIA] TL* THE CONTACT OWNS A 2012 GMC ACADIA. THE CONTACT STATED THAT WHILE TRAVELING 20 MPH, THE STEERING WHEEL DETACHED FROM THE VEHICLE. THE VEHICLE WAS TOWED TO THE DEALER AND THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE VEHICLE WAS NOT REPAIRED. THE FAILURE AND CURRENT MILEAGES WERE 300.

**Edmunds Complaints:**

(a)     [2010 GMC Acadia]  [T]his forum makes me sick to my stomach! We too have been having all of the same issues! took in for poping noise when turning wheel and transmission issues, and back up camara. My extended warrenty covered the steering problem ($200 deductible) but they could not get the transmission to act up, so it wasn't worked on. After taking home, the transmission contiued to act up, and then it started leaking transmission fluid. Back to the shop we go! they rebuilt the transmission (car has 60,000 miles) fixed the leaks and replaced the water pump because it apparently had a leak too! (another $200 deductible) yay! no more problems, right? UM.... NO! The trasmission is still slipping! so I get online to do some research and find that this is a common problem! And the response I see on her from GMC are a disgrace! I don't even know what to do now? I dont have the time, energy, patience, or money to keep takeing my car to the shop! this car has been in the shop more times then all of my previous cars put together! I WILL NEVER BUY A GMC AGAIN!  (Edmunds, *GMC Acadia Problems and Repairs – Car Forums  Edmunds* (February 15, 2013),                                            http://townhall-talk.edmunds.com/direct/view/.f1310a2/1955#MSG1955)

(b)     [2010 GMC Acadia]  What is the mileage on your 2010? GMC admits that the power steering pump they used was too small for the size of the vehicle, for I'm not surprised to hear it failed multiple times.  (Edmunds, *GMC Acadia Problems and Repairs – Car Forums   Edmunds* (February 15,                          2013),                          http://townhall-talk.edmunds.com/direct/view/.f1310a2/1955#MSG1867)

(c)     In regard to the Dexron fluid vs. non-Dexron Fluid, it hardly matters when the power steering fluid is leaking out of the bearings on both end of your power steering rack. I have owned many GM vehicles, and I usually drive them to well over 100,000 miles without ever having to replace a power steering rack. The one on my Adadia only lasted 3 years, when it was just out of the mileage warranty (Cost $1,200). The bearings in the steering column had already been replaced at 30,000 miles when it was under warranty. This car obviously had design flaws and/or cheap parts. Traded it in immediately for a Ford Edge. Rides nicer, no repair issues.  (Edmunds, *GMC Acadia Problems and Repairs – Car Forums   Edmunds* (February 15, 2013), http://townhall-talk.edmunds.com/direct/view/.f1310a2/1844#MSG1844)

(d)     [2009 GMC Acadia]  Your thread sounds so familiar that I could have written it. We got stuck 500 miles away from home at a soccer tournament for cylinder misfires. Two months after they fixed cylinders 2 and 6, cylinder numbers 3 and 5 started misfiring. They replaced the remainder. At one year, the bushings in the steering column went. We

had multiple headlamp repairs and these things were designed so poorly that a headlamp going out requires a trip to the dealership since you have to go in through the wheelwell to replace it. We had trouble getting tires since they are such a strange size that no one stocks them. Got stuck again at another soccer tournament last month when the water pump went. After it was towed back to the dealership I asked them to check a squealing noise in the steering column and it turned out I needed a whole new power steering rack ($1,200). Never have I had a car with this many problems in the first 3 years. I asked GM to chip in for part of the repair and they refused so I traded it in on a Ford Edge. That's the last GM that will sit in my driveway after 28 years of GM ownership.  (Edmunds, *GMC Acadia Problems and Repairs – Car Forums        Edmunds*   (February   15,   2013),   http://townhall-talk.edmunds.com/direct/view/.f1310a2/1789)

(e)     [2009 GMC Acadia]  We bought our 2009 GMC Acadia new, and have had nothing but trouble. I love the interior- it gets my 4 children around with comfort- but I hate that I have it at the dealership with such regularity! We've had the power train go out- which left me stranded with 4 young children one evening. The steering column went out- luckily I was near home and managed to get home safely. We've had the "check engine light" come on more times than I can count- multiple times for "cylinder misfiring". The tire pressure sensor had to be replaced, and still doesn't work properly (multiple repairs and trips to the dealer for that!). Has anyone had this much trouble with the Acadia? Does anyone know if any of these were just "bugs" that got worked out in later models? (Edmunds, *GMC Acadia Problems and Repairs – Car Forums        Edmunds*   (February   15,   2013),   http://townhall-talk.edmunds.com/direct/view/.f1310a2/1785)

(f)     [2010 GMC Acadia]  I have three beautiful children that I have to take to daycare, school, games, doctor appointments, etc and thought this was a nice looking very helpful and dependable vehicle that our family could use to do the job. Oh boy. I have owned this 10 since February of 2011. I have taken this hunk of junk to the dealership more than 5 times. The oxygen sensors went out-I had them replaced. The rack and pinion had to be replaced. The lift gate shocks had to be replaced. The water pump had to be replaced and as of today the power steering pump. Not to mention the $900 set of cooper tires that we had put on because the Goodyear brand roared like mud tires. Lo and behold there are only two sets to choose from. The Cooper's roar too. Even though some of this was covered by warranty we have honestly spent more money to FIX this vehicle than the yearly payment! There is a HORRID smell of wet dog/mold/mildew that comes out of the vents when you turn on the air/heat. It seriously makes you gag. This will be the last acadia or GMC product this mother will buy. This was an experience I will never forget. (Edmunds,   *GMC   Acadia   Problems   and   Repairs   –   Car   Forums Edmunds*     (February     15,     2013),     http://townhall-talk.edmunds.com/direct/view/.f1310a2/1774)

(g)     [2008 GMC Acadia]  Many times when the check engine light comes on for the 08 acadia means you need a new timing chain.. Also, the noise in the wheel may mean you need new powersteering, because the power steering is an issue plaguing old acadias and that makes for an unsettling noise.  (Edmunds, *GMC Acadia Problems and Repairs – Car Forums*

*Edmunds* (February 15, 2013), http://townhall-talk.edmunds.com/direct/view/.f1310a2/1733)

(h)  [2008 GMC Acadia]  Honestly, and i hate to say this, but you have been lucky with your 2008 acadia.. many people have had MAANY more problems than that with them. The power steering and a c issues happen frequently, as well as water pumps, timing chains, leakng, and transmissions. If you have any way to do so, I suggest you get a different car.. This may not be an option but the 08 acadia is very unreliable, so it may be a better bet in the long run.  (Edmunds, *GMC Acadia Problems and Repairs – Car Forums  Edmunds* (February 15, 2013), http://townhall-talk.edmunds.com/direct/view/.f1310a2/1732)

(i)  [2010 GMC Acadia]  I just had my Acadia into a different dealer ship. The first dealer re balanced the tires and the shimming still continued. Then I took it to a second dealership yesterday and they road force balanced the tires. $110 later, my Acadia still has a shimmy in the steering wheel at speeds of around 60-65 miles per hour. I have 20,000 miles on the vehicle, but this all started at around 15,000 miles. (Edmunds, *GMC Acadia Problems and Repairs – Car Forums  Edmunds* (February 15, 2013), http://townhall-talk.edmunds.com/direct/view/.f1310a2/1707)

(j)  [2010 GMC Acadia]  Try contacting the BBB Autoline in your state to file a complaint or hire a lawyer. We have had many issues with 2010 Acadia re steering and also feel it is unsafe to drive. The local dealer where we bought it was of no help. We contacted the BBB and currently are looking at a buyback. Hope all works out.  (Edmunds, *GMC Acadia Problems and Repairs – Car Forums  Edmunds* (February 15, 2013), http://townhall-talk.edmunds.com/direct/view/.f1310a2/1698#MSG1698)

(k)  [2010 GMC Acadia]  I also have a 2010 Acadia and have noticed the steering wheel shaking mostly on aceleration and when I reach the speeds of 60-65. I have had the tires rebalanced, but that did not solve the problem. Have you been able to have yours fixed for this issue? (Edmunds, *GMC Acadia Problems and Repairs – Car Forums  Edmunds* (February 15, 2013), http://townhall-talk.edmunds.com/direct/view/.f1310a2/1696)

(l)  [2010 GMC Acadia]  "You should probably look at getting rid of the Acadia and get another vehicle." Yes. This is probably the best option after the problem is fixed. I have been driving 5 different vehicles, none of them had steering problem before 100K. I usually have 5 kids from 5-9 year old in the car. If the steering is failure during driving with them in the car, it could be horrible disaster. UPDATE: After several calls around and waited for 20 minutes, I got the GM Rep. that is handing my case. His answer were "I can not do any thing....I can not force the dealer to fix......you can drive the car for 30 days as recommend or bring to other dealer." Finally, I had to slowly drive my car back home. Not sure what to do next.  (Edmunds, *GMC Acadia Problems and Repairs – Car Forums  Edmunds* (February 15, 2013), http://townhall-talk.edmunds.com/WebX?14@@.f1310a2/1691#MSG1691)

(m)  [2010 GMC Acadia]  I brought my 2010 Acadia to local dealer to fix

steering wheel binding problem that causes the steering freely move about 10 degrees before actually turning the front wheels. This happens when park or driving that makes me nervous while drive the car. The dealer replaced the steering gear, but the problem still the same. I brought the car back to dealer, they replaced the power steering. However, the binding problem is still remaining with addition noise when turning the steering. The service adviser told me that GM recommends driving the car for 30 days the problem will go away. I am not confident with his advice after replaced two different parts and the problem still the same, so I asked him to write the GM recommend on the receipt but he refused!!!!!!!!!!!  I am not brave enough to drive the car with my kids with steering issue, so I call GM customer service. The customer service Rep. asked me to bring the car back to dealer. However, after hold my car for a day, the service adviser asked me go back to take my car, and told me that they will not to do anything with my car until I driving for 30 days. They also suggested me to bring to another dealer. I call GM customer again, but could not get any help because the Rep. that is assigned on my case was not available. I had the Acadia 2010 only 2 year 4 months, but had to bring to GM dealer SEVEN times for safety related problems • FOUR times for steering problem (replaced gear twice, gear housing twice, inlet hose, set toe, and power steering bump). Now the problem is still remaining, and need the FIFTH time!!!! • Replace brake master cylinder • 2 safety recalls Could you please advice what should I do? My car still in the dealer and I am not confident to drive the car with steering defective.  (Edmunds, *GMC Acadia Problems and Repairs – Car Forums  Edmunds* (February 15, 2013), http://townhall-talk.edmunds.com/direct/view/.f1310a2/1688#MSG1688)

(n)  [2010 GMC Acadia]  I purchased 2010 Acadia brand new and have never been so disappointed and frustrated. This is my first and last GMC car I will every purchase. I have had more issues with this car than any other car I have ever owned. Everytime I take it in for routine service there are "warranty" issues that need to be addressed. These included problems with power steering, transmission, and oil leaks. What happens when the warrany runs out?? I'll be screwed.  (Edmunds, *GMC Acadia Problems and Repairs – Car Forums  Edmunds* (February 15, 2013), http://townhall-talk.edmunds.com/direct/view/.f1310a2/1688#MSG1667)

(o)  [2009 GMC Acadia]  I posted a message about the problems im having with my 09 Acadia on January of 2012. After nearly having a accident when the steering colum fail.. and other problems like Clunking noise on front of the vehicle, 3 different code need re-programming for "engine problem" and replacing my steering columm which GMC agreed to pay half of the repair. I really felt they should have pay the whole thing since this issue is widely spread on this type of vehicle. Now I still have the clunking noise which I am now use to live with it, the re-programming of the transmission seems to made my shifting worst right around 65-75mph. Now lately my rear latch shocks for the rear access door are shot! I ended replacing them my self instead of bringing it to the shop...and just today 4/21/2012 my rear access door latch don't want to open no matter how much I push, pull or tug on the handle...We are on the park with my kids and their bikes, when I tried openning the trunk with no avail, I ended calling my friend with a pick-

up truck to help us out..To make matter worst there is no manual release button or back-up release for the trunk or rear access door...I AM REALLY, REALLY, REALLY sick of this piece of junk...I guess I will be calling the shop for repair!!! ****WARNING IF YOU ARE READING THIS DO NOT BUY THIS PIECE OF JUNK I AM TRYING TO SAVE YOU FROM HEAD ACHE"  (Edmunds, *GMC Acadia Problems and Repairs – Car Forums  Edmunds* (February 15, 2013),                                                                http://townhall-talk.edmunds.com/direct/view/.f1310a2/1688#MSG1649)

(p)      [2008 GMC Acadia]  I bought my Acadia used in October of 2011. 6 months later and it has been in the shop 5 times!!! The things that I have had gone wrong are Master Cylinder replaced, headlight recall, a/c replaced, air bag sensor, heated seat melted the airbag sensor, transmission wave plate replaced, leaky sunroof, and intake tuning valve stuck. The lady before me has done the sunroof leak as well, water pump, steering (a couple times) and a/c. I paid $28000 plus fees and warranties for a car that is in the shop once a month. The dealer isn't much help, they will let me trade it in but only giving me $24000 as a trade-in while i still owe $30000, because I have only had the car 6 months. I am not sure what I am going to do but I am so unhappy with this car. This car is for sure a lemon but I have been told that used cars don't qualify as lemons. I am going to start complaining to GM and see what they will do for their costumers.   (Edmunds, *GMC Acadia Problems and Repairs – Car Forums  Edmunds* (February 15, 2013), http://townhall-talk.edmunds.com/direct/view/.f1310a2/1688#MSG1644)

(q)      [2009 GMC Acadia] We have already decided that we are going to get rid of this nightmare of a car so no need for any GM rep to say they understand our frustration and would like to help. I feel that it is my duty to let everyone know what a dog this Acadia is. There have been so many problems I know I can't remember them all, but I will try. Water pump - we were told it was getting hot because the oil wasn't changed regularly, after verifying that the oil had been changed when it should have been, it was a defective water pump.The navigation unit went bad and was replaced. A month later we got the new nav disk. The steering gear assembly was replaced. The complete rack and pinion steering system was replaced. The steering column and air bag coil was repaired and or replaced twice.The battery died within a year and was replaced. The radio was replaced after the bat. died again. All of the headlights, high & low have been replaced twice. The right side wiring harness had melted and was replaced. Have it at the dealer now getting the left harness replaced and new bulbs. Drivers seat track was binding and was replaced. The heated windshield washer assembly was removed and disabled so it won't cause a fire. (They refunded us $100 for the loss of this option). 12v plug in the back seat blew the fuse several times and currently does not work. Gas & brake pedels still squeak after dealer repaired them. Service air bag light on, bad connector changed. Tire air pressure light comes, then goes off, then comes on. The rubber coating on the AC button and others has rubbed off and is now bright green instead of grey. I know there are some things I have left out. Another thing that I hate about this car is you have to remove the front tires and wheel well liners to access the headlight bulbs, even then it is tough to reach them. The battery is located under the feet of the person in the

right back seat. There is a cardboard cover with carpet over it that seperates the battery from the cabin. If this vehicle ever rolls over better hope your baby is not straped in under the leaking battery. I thought batteries inside the car went out with the old VW bugs. If you look in the manual for how to replace the headlights or battery, it refers you to the dealer. If I would have read that I would not have bought this car. I have learned a valuable lesson with this lemon, don't buy GM! (Edmunds, *GMC Acadia Problems and Repairs – Car Forums Edmunds* (February 15, 2013), http://townhall-talk.edmunds.com/direct/view/.f1310a2/1688#MSG1402)

(r)    [2009 GMC Acadia]  Back again with a follow-up. Nice of the dealer tech not to check for anything like nails in the tire when the pressure was low at the last service call, which turned out to be the case. When tire went low I took the poor Acadia to Goodyear and got that problem fixed properly the first time. So the power steering sound keeps getting louder and now the truck makes odd noises while idling. I should take it in but we need the truck while we're on call to rush in for my wife going into labor. We have a complaint case number with GMC (71-986198005). So far the GMC rep at the call center has lied to me twice. First was to tell me the area representative would contact me within 48 hours. A couple weeks later and still no call from this person and no response to my voice mails. So I call in again and I'm told the case has been referred to another group with GMC and that they'll contact me within 48 hours. Well over a week and not a sign of life. I tried calling the number I was given. Unless you know which specific group you've been sent to there's no escaping the automated system. This morning a colleague tells me she's considering the Acadia because mine looks so nice. I did the right thing and told her to get a more reliable make. Our son is due by next Wednesday. We'll have more help around the house and will be able to go out and find someone to trade this nice looking 22K mile SUV to without having to haul all the children with us. You can bet we won't be trading for a GMC or any other GM product after this. Who needs the hassle of such poor customer service and product? Nissan and Volvo are looking like very strong contenders for our money.  (Edmunds, *GMC Acadia Problems and Repairs – Car Forums Edmunds* (February 15, 2013), http://townhall-talk.edmunds.com/direct/view/.f1310a2/1323#MSG1323)

### Defendants' Knowledge of the Steering Defect

47.    Defendants had superior and exclusive knowledge of the Steering Defect and knew or should have known that the defect was not known or reasonably discoverable by Plaintiff and Class Members prior to their purchase or lease of the Class Vehicles.

48.    Plaintiff is informed and believes and based thereon alleges that Defendants acquired their knowledge of the Steering Defect prior to 2008 through sources not available to Plaintiff or Class Members, including, but not limited to, pre-release testing data and early consumer complaints to Defendants and their dealers about the Steering Defect in the Class

Vehicles.  Other reliable sources include, without limitation, other earlier model year versions of such vehicles[4], testing conducted in response to reported complaints, aggregate data from GM dealers, such as dealer repair orders, high warranty reimbursement rates that can cost hundreds and sometimes thousands of dollars for each vehicle, consumer complaints online reported to GM customer care agents on internet forums, and other internal sources.

49.     Defendants have been aware of the Steering Defect since at least February of 2009, before the Class Vehicles were sold, and when the first Technical Service Bulletin (TSB) addressing the issue was released.  In or around February of 2009, Defendants issued TSB PIT4537C, which addressed a "Whine or moan from the power steering."  Further, on November 12, 2009, Defendants released another Technical Service Bulletin, TSB PIT4879A, titled "Power steering whine or moan noise."  On February 12, 2010, Defendants issued TSB 09-02-34-001A, titled "Squeak/Rattle Noise from Steering Column."   On March 17, 2010, Defendants issued TSB PI0029A, titled "Squeak, Moan or Rub Type Noise When Turning Steering Wheel at Slow Speeds."  On March 1, 2010, Defendants issued TSB PIT4985, titled "Clunk or Knock Noise When Turning."  On February 16, 2010, Defendants issued PIT4632A, titled "Click or Clunk Noise From Steering Column When Turning."  Despite these repeated attempts by Defendants to repair the Steering Defect, none have yet been successful.

50.     Defendants have issued different iterations and updates to the preceding Technical Service Bulletins.  Further, additional Technical Service Bulletins relating to the Steering Defect other than those listed above, may have been issued by Defendants.  However, none have succeeded in repairing the Steering Defect.

51.     Moreover, on an internet forum devoted to Defendants' vehicles, http://www.acadiaforum.net, Defendants have regularly surveyed, researched and communicated with Class Vehicle owners regarding issues they were having with their vehicles.  As agents of Defendants, those customer service representatives clearly had

---

[4] For example, earlier model years of the GMC Acadia equipped with a similar steering system to that of the Class Vehicles were covered under earlier Technical Service Bulletins for similar issues.

knowledge of Steering Defect by at least June of 2010, prior to Plaintiff's purchase of his vehicle.  Upon information and belief, Defendants monitor many third party websites, blogs, publications, and forums and, as such, have large, aggregate amounts of consumer complaints regarding the Steering Defect.

52.     As recently as March of 2012, Defendants issued an article in GM Tech Link, which describes itself as a "monthly publication for GM Dealership Service Professionals." In an article titled "Steering Gear Replacement Guidelines," four different technical service bulletins are listed as possible repairs for complaints concerning the steering system.  The affected vehicles listed in the Guidelines are the 2008-2012 Traverse, 2007-2012 Enclave and Acadia, and 2007-2010 Outlook, which completely subsumes the Class Vehicles.  Defendants' knowledge of the defect is clear through the Technical Service Bulletins and Steering Replacement Guidelines issued.

53.     Upon information and belief, the Class Vehicles designed, manufactured, distributed, marketed, serviced, repaired, sold and leased by Defendants are substantially similar, if not identical to previous model years of the Class Vehicles designed, manufactured, distributed, marketed, serviced, repaired, sold and leased by General Motors Corporation prior to July 10, 2009, since it was Defendants who acquired substantially all of the assets of General Motors Corporation and continued to sell the Class Vehicles.

54.     Furthermore, upon information and belief, previous model years of the Class Vehicles exhibit the same exact defect that plagues Class Vehicles.  Vehicles manufactured by Defendants prior to July 10, 2009 are prone to the Steering Defect, as evidenced by Technical Service Bulletins issued by GM and NHTSA complaints.

55.     The existence of the Steering Defect would be considered material by a reasonable consumer deciding whether to purchase or lease a vehicle.  Had Plaintiff and Class Members known that the Class Vehicles were equipped with a defective steering system, they would not have purchased the Class Vehicles or would have paid less for them.

56.     Reasonable consumers, like Plaintiff, expect and assume that a vehicle's steering system is safe, will function in a manner that will not pose an unreasonable safety

hazard, and is free from defects.  Plaintiff and Class Members further expect and assume that Defendants will not sell or lease vehicles with known safety defects, such as the Steering Defect, and will disclose any such defects to its consumers when it learns of them.  They do not expect Defendants to fail to disclose the Steering Defect to them, to continually deny the defect, to replace defective components with the same defective components, and to charge them thousands of dollars to repair the defective steering system.

**Defendants have Actively Concealed the Steering Defect**

57.     While Defendants have been fully aware of the Steering Defect in the Class Vehicles, they have actively concealed the existence and nature of the defect from Plaintiff and Class Members at the time of purchase, lease or repair and thereafter.  Specifically, Defendants have failed to disclose or actively concealed at and after the time of purchase, lease or repair:

(a)     Any and all known material defects or material non-conformity of the Class Vehicles, including the defects relating to the steering system;

(b)     That the Class Vehicles, including their steering systems, were not in good working order, were defective, and were not fit for their intended purposes; and

(c)     That the Class Vehicles and their steering system were defective, despite the fact that GM learned of such defects through alarming failure rates, customer complaints, as well as through other internal sources, as early as 2008, if not before.

58.     As a result of the Steering Defect, Defendants were inundated with complaints regarding the steering system.  Since at least February of 2009, GM has released no less than six different Technical Service Bulletins relating to the steering system for issues ranging from, in Defendants' words, "Grinding noise coming from the front of the vehicle while driving," "whine or moan noise when making turns in slow speed," "squeak, moan or rub type noise when turning steering wheel at slow speeds," and "click or clunk noise from the steering column when turning."

59.     Upon information and belief, the Technical Service Bulletins outlined have been ineffective at addressing the Steering Defect.

60.     Defendants have caused Plaintiff and Class Members to expend money at their dealerships to repair or replace the Class Vehicles' steering system, despite Defendants' knowledge of the Steering Defect.

61.     When consumers present the Class Vehicles to an authorized GM dealer for repair of the steering system, consumers are typically told they must pay for the repair.

62.     Whether or not consumers are forced to pay for the repair, the same defective part is used to replace the prior defective part.

63.     To this day, Defendants still have not notified Plaintiff and Class Members that the Class Vehicles contain a systemic defect that causes the steering system to malfunction.

**TOLLING OF THE STAUTE OF LIMITATIONS**

64.     Because the defects in the design or manufacturer of the Class Vehicles and their steering system cannot be detected until the defect manifests itself, Plaintiff and Class Members were not reasonably able to discover the problem until after purchasing or leasing the Class Vehicles, despite their exercise of due diligence.

65.     Plaintiff and Class Members had no realistic ability to discern that the steering system was defective until it prematurely failed, and would have no reason to believe that problems they encountered were caused by a widespread, systemic defect.  Therefore, the discovery rule is applicable to the claims asserted by Plaintiff and Class Members.

66.     Plaintiff is informed and believes and based thereon alleges that GM has known of the Steering Defect since 2008, if not earlier, and has concealed from or failed to alert owners and lessees of the Class Vehicles of the defective nature of their steering system.

67.     Any applicable statute of limitation has therefore been tolled by GM's knowledge, active concealment, and denial of the facts alleged herein.  GM is further estopped from relying on any statute of limitation because of its concealment of the defective nature of the Class Vehicles and their steering system.

///

FIRST AMENDED CLASS ACTION COMPLAINT

**CLASS ACTION ALLEGATIONS**

68.     Plaintiff brings this lawsuit as a class action on behalf of himself and all others similarly situated as members of the proposed Plaintiff Classes pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) and/or (b)(2).  This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of those provisions.

69.     The Class and Sub-Class are defined as:

    (a)     <u>Nationwide Class</u>: All individuals in the United States who purchased or leased a 2009 through 2012 GM Acadia, 2009 through 2012 Buick Enclave, or 2009 through 2012 Chevrolet Traverse vehicles manufactured and sold after July 10, 2009 (the "Nationwide Class").

    (b)     <u>CLRA Sub-Class</u>: All members of the Nationwide Class who reside in the State of California who are "consumers" within the meaning of California Civil Code § 1761(d) (the "CLRA Sub-Class").

    (c)     <u>Implied Warranty Sub-Class</u>:  All Members of the Nationwide Class who purchased or leased their vehicles in the State of California (the "Implied Warranty Sub-Class").

    (d)     The Implied Warranty and CLRA Sub-Classes are collectively referred to as the "California Sub-Classes."

70.     Excluded from the Class and California Sub-Classes are: (1) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, assigns and successors; (2) the Judge to whom this case is assigned and the Judge's staff; and (3) those persons who have suffered personal injuries as a result of the facts alleged herein.  Plaintiff reserves the right to amend the Class and California Sub-Classes definitions if discovery and further investigation reveal that the Class and California Sub-Classes should be expanded or otherwise modified.

71.     There is a well-defined community of interest in the litigation and the Class is readily ascertainable.

72.     <u>Numerosity</u>:  Members of the Class number in the tens of thousands, making joinder impracticable.  The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court.  The Class Members are readily identifiable from information and records in Defendants' possession, custody, or control, as well as from records kept by the department of motor vehicles of the various states.

73.     <u>Typicality</u>:  The claims of the representative Plaintiff are typical of the claims of the Class in that the representative Plaintiff, like all Class Members, purchased and leased a Class Vehicle designed, manufactured, and distributed by Defendants and equipped with a defective steering system.  The representative Plaintiff, like all Class Members, has been damaged by Defendants' misconduct in that he has incurred or will incur the cost of repairing or replacing the defective steering system.  Furthermore, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread resulting in injury to all Class Members.

74.     <u>Commonality</u>:  There are numerous questions of law and fact common to Plaintiff and Class Members that predominate over any question affecting only individual Class Members.  These common legal and factual issues include:

     (a)     Whether the Class Vehicles contain defects relating to the steering system;

     (b)     Whether the defects relating to the steering system constitute an unreasonable safety risk;

     (c)     Whether Defendants knew about the defects relating to the steering system and, if so, how long Defendants have known of the defect;

     (d)     Whether the defective nature of the steering system constitutes a material fact;

     (e)     Whether Defendants have a duty to disclose the defective nature of the steering system to Plaintiff and Class Members;

     (f)     Whether Plaintiff and Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

(g)    Whether Defendants should be declared financially responsible for notifying all Class Members of the problems with the Class Vehicles and for the costs and expenses of repairing and replacing the defective steering system;

(h)    Whether Defendants are obligated to inform California Class Members of their right to seek reimbursement for having paid to diagnose, repair, and replace their defective steering system;

(i)    Whether Defendants breached the implied warranty of merchantability pursuant to the Song-Berly Act; and

(j)    Whether Defendants violated the Magnuson-Moss Warranty act by failing to disclose to consumers that they are required to maintain their steering system.

75.    <u>Adequate Representation:</u>  Plaintiff will fairly and adequately protect the interests of Class Members.  Plaintiff has retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiff intends to prosecute this action vigorously.

76.    <u>Superiority:</u>  Plaintiff and Class Members have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.  Because of the relatively small size of individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct.  Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue without remedy.  Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of the adjudication.

77.     In the alternative, the Class may be certified because:

(a)     The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants;

(b)     The prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class Members not a party to the adjudications, or substantially impair or impede their ability to protect their interests; and

(c)     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the members of the Class as a whole.

## FIRST CAUSE OF ACTION

### (Violation of California's Consumer Legal Remedies Act,

### California Civil Code § 1750, *et seq.*)

78.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

79.     Plaintiff brings this cause of action on behalf of himself and on behalf of the Nationwide Class, or, in the alternative, on behalf of the California Sub-Classes, against all Defendants.

80.     Defendants are "persons" as defined by California Civil Code § 1761(c).

81.     Plaintiff and Class Members are "consumers" within the meaning of California Civil Code § 1761(d).

82.     By failing to disclose and concealing the defective nature of the steering system from Plaintiff and prospective Class Members, Defendants violated California Civil Code § 1770(a), as they (1) represented that the Class Vehicles and their steering system had characteristics and benefits that they do not have, and (2) represented that the Class Vehicles

1    and their steering system were of a particular standard, quality, or grade when they were of

2    another.  *See* Cal. Civ. Code §§ 1770(a)(5) & (a)(7).

3        83.    Defendants' unfair and deceptive acts or practices occurred repeatedly in

4    Defendants' trade or business, were capable of deceiving a substantial portion of the

5    purchasing public, and imposed a serious safety risk on the public.

6        84.    Defendants knew that the Class Vehicles and their steering system suffered

7    from an inherent defect, were defectively designed or manufactured, would fail prematurely,

8    and were not suitable for their intended use.

9        85.    Defendants were under a duty to Plaintiff and Class Members to disclose the

10   defective nature of the steering system and/or the associated repair costs because:

11            (a)    Defendants were in a superior position to know the true state of facts

12                  about the safety defect in the Class Vehicles' steering system;

13            (b)    Plaintiff and Class Members could not reasonably have been expected to

14                  learn or discover that their steering system had a dangerous safety defect

15                  until manifestation of the failure; and

16            (c)    Defendants knew that Plaintiff and Class Members could not reasonably

17                  have been expected to learn or discover the safety defect.

18       86.    In failing to disclose the defective nature of the steering system, Defendants

19   have knowingly and intentionally concealed material facts and breached their duty not to do

20   so.

21       87.    In fact, instead of disclosing the Steering Defect contained in the Class

22   Vehicles, Defendants falsely represented in their brochures, press releases and other materials

23   that the Class Vehicles' steering system were "precise and accurate."

24       88.    The facts concealed or not disclosed by Defendants to Plaintiff and Class

25   Members are material in that a reasonable consumer would have considered them to be

26   significant in deciding whether or not to purchase or pay a lesser price for the Class Vehicles.

27   Had Plaintiff and Class Members known that the Class Vehicles' steering system was

28   defective, they would not have purchased the Class Vehicles or would have paid less for them.

89.     Plaintiff and Class Members are reasonable consumers who do not expect the steering system installed in their vehicles to fail prematurely.  This is the reasonable and objective consumer expectation relating to vehicle steering systems.

90.     As a result of Defendants' conduct, Plaintiff and Class Members have been harmed and suffered actual damages in that the Class Vehicles have undergone and will continue to undergo premature steering system failures.

91.     As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Plaintiff and Class Members have suffered and will continue to suffer actual damages.

92.     Plaintiff has attached hereto as Exhibit A the declaration of venue required by Civil Code section 1780(d).

93.     On or about March 20, 2013, pursuant to California Civil Code § 1782(a), Plaintiff notified Defendants in writing of the particular violations of the CLRA and demanded that Defendants rectify the problems associated with the behavior detailed above, which acts and practices are in violation of California Civil Code § 1770.  True and correct copies of the letters are attached hereto as Exhibit B.

94.     Defendants failed to adequately respond to Plaintiff's above-described demands and failed to give notice to a ll affected consumers, pursuant to California Civil Code § 1782.

95.     Plaintiff seeks an order enjoining the acts and practices described above, restitution of property, and any other relief that the court deems proper.

96.     Plaintiff additionally seeks damages, restitution, punitive damages, attorneys' fees and costs, and any other relief under § 1780(a) of the CLRA pursuant to Civil Code section 1782(d), due to Defendants' failure to rectify or agree to adequately rectify their violations as detailed above.

///

///

///

///

FIRST AMENDED CLASS ACTION COMPLAINT

**SECOND CAUSE OF ACTION**

**Violation of California Business & Professions Code § 17200, *et seq.***

**(Against All Defendants)**

97.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

98.     Plaintiff brings this cause of action on behalf of himself and on behalf of the Nationwide Class, or, in the alternative, on behalf of the California Sub-Classes against all Defendants.

99.     California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

100.     Plaintiff and Class Members are reasonable consumers who do not expect their steering system to prematurely fail.

101.     Defendants knew the Class Vehicles and their steering system suffered from inherent defects, were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

102.     Defendants were under a duty to Plaintiff and Class Members to disclose the defective nature of the Class Vehicles and their steering system because:

(a)     Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles' steering system;

(b)     Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles and their steering system; and

(c)     Defendants actively concealed the defective nature of the Class Vehicles and their steering system from Plaintiff and the Class.

103.     In failing to disclose the defects in the steering system, Defendants have knowingly and intentionally concealed material facts and breached their duty not to do so.

104.     The facts concealed or not disclosed to Plaintiff and Class Members by

Defendants are material in that a reasonable person would have considered them to be important in deciding whether to purchase Class Vehicles.  Had Plaintiff and Class Members known that the Class Vehicles' steering system was defective, Plaintiff and Class Members would not have purchased Class Vehicles or would have paid less for them.

105.   Defendants continued to conceal the defective nature of the Class Vehicles and their steering system even after Class Members began to report problems.  Indeed, Defendants still continue to cover up and conceal the true nature of the problem.

106.   By their conduct, Defendants have engaged in unfair competition and unfair business practices.

107.   Defendants' unfair acts or practices occurred repeatedly in Defendants' trade or business and were capable of deceiving a substantial portion of the purchasing public.

108.   In addition, as set forth herein, Defendants' acts and practices alleged herein are unlawful because they violate California Civil Code §§ 1770 (a)(5), 1770 (a)(7), 1770(a)(9), 1792 *et seq.*, and 1795.90 *et seq.*, California Commercial Code § 2313, and 15 U.S.C. § 2301 *et seq.*

109.   Further, as set forth herein, Defendants' acts and practices alleged herein are deceptive in that they were capable of misleading or deceiving a substantial portion of the purchasing public.

110.   As a direct and proximate result of Defendants' unfair practices, Plaintiff and Class Members have suffered and will continue to suffer actual damages.

111.   As a direct and proximate result of Defendants' unlawful practices, Plaintiff and Class Members have suffered and will continue to suffer actual damages.

112.   As a direct and proximate result of Defendants' deceptive practices, Plaintiff and Class Members have suffered and will continue to suffer actual damages.

113.   Defendants have been unjustly enriched and should be required to make restitution to Plaintiff and Class Members, pursuant to Business & Professions Code §§ 17203 and 17204.

///

**THIRD CAUSE OF ACTION**

**(Breach of Implied Warranty Pursuant to Song-Beverly Consumer Warranty Act,**

**California Civil Code §§ 1792 and 1791.1 *et seq.*)**

114.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

115.    Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the Implied Warranty Sub-Class.

116.    Defendants were at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles.  Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased.

117.    Defendants provided Plaintiff and Class Members with an implied warranty that the Class Vehicles and any parts thereof are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles and their steering system suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

118.    Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use.  This implied warranty included, among other things: (1) a warranty that the Class Vehicles and their steering system were manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation; and (2) a warranty that the Class Vehicles and their steering system would be fit for their intended use while the Class Vehicles were being operated.

119.    Contrary to the applicable implied warranties, the Class Vehicles and their steering system at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation.  Instead, the Class Vehicles are defective, including but not limited to the defective design and manufacture of their steering system.

120.   Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1 *et seq.*

**FOURTH CAUSE OF ACTION**

**(Breach of Written Warranty under the Magnuson-Moss Warranty Act,**

**15 U.S.C. § 2303 *et seq.*)**

121.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

122.   Plaintiff brings this cause of action on behalf of himself and on behalf of the Nationwide Class, or, in the alternative, on behalf of the California Sub-Classes, against all Defendants.

123.   The Class Vehicles are a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

124.   Plaintiff and Class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

125.   Defendants are "suppliers" and "warrantors" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

126.   Defendants' express warranty is a "written warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).

127.   Defendants breached the express warranty by:

(a)   Extending a 3 year/36,000 miles Basic[5] and 5 year/ 100,000 miles Drivetrain warranty with the purchase or lease of the Class Vehicles, thereby warranting to repair or replace any part defective in material or workmanship, including the subject steering system, at no cost to the owner or lessee;

(b)   Selling and leasing Class Vehicles with steering systems that were defective in material and workmanship, requiring repair or replacement

---

[5] The Buick Enclave comes with a 4 year/50,000 mile bumper-to-bumper warranty.

within the warranty period; and

      (c)     Refusing to honor the express warranty by repairing or replacing, free of charge, the steering system or any of its component parts or programming and instead charging for repair and replacement parts.

128.    Defendants' breach of the express warranty has deprived Plaintiff and Class Members of the benefit of their bargain.

129.    The amount in controversy of Plaintiff's individual claims meet or exceeds the sum or value of $25,000.  In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

130.    Defendants have been afforded a reasonable opportunity to cure their breach of written warranty, including when Plaintiff and Class Members brought their vehicles in for diagnoses and repair of the steering system.

131.    As a direct and proximate cause of Defendants' breach of written warranty, Plaintiff and Class Members sustained damages and other losses in an amount to be determined at trial.  Defendants' conduct damaged Plaintiff and Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

132.    As a result of Defendants' violations of the Magnuson-Moss Warranty Act as alleged herein Plaintiff and Class Members have incurred damages.

**FIFTH CAUSE OF ACTION**

**(For Breach of Express Warranty Under Cal. Comm. Code § 2313)**

**(Against All Defendants)**

133.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

134.    Plaintiff brings this cause of action on behalf of the Nationwide Class, or, in the alternative, on behalf of the California Sub-Classes.

135.    Defendants provided all purchasers and lessees of the Class Vehicles with the

express warranty described herein, which became a material part of the bargain.  Accordingly, Defendants' express warranty is an express warranty under California law.

136.    The steering system and its components and/or programs were manufactured by Defendants in the Class Vehicles and are covered by the express warranty.

137.    Defendants breached the express warranty by:

(d)    Extending a 3 year/36,000 miles Basic[6] and 5 year/ 100,000 miles Drivetrain warranty with the purchase or lease of the Class Vehicles, thereby warranting to repair or replace any part defective in material or workmanship, including the subject steering system, at no cost to the owner or lessee;

(e)    Selling and leasing Class Vehicles with steering systems that were defective in material and workmanship, requiring repair or replacement within the warranty period; and

(f)    Refusing to honor the express warranty by repairing or replacing, free of charge, the steering system or any of its component parts or programming and instead charging for repair and replacement parts.

138.    Plaintiff was not required to notify Defendants of the breach and/or was not required to do so because affording Defendants a reasonable opportunity to cure its breach of written warranty would have been futile.  Defendants were also on notice of the defect from the Office of Defects Investigation's ("ODI") investigation, the complaints and service requests it received from Class Members, and through other internal sources.

139.    As a direct and proximate cause of Defendants' breach, Plaintiff and Class Members have suffered damages and continue to suffer damages, including economic damages at the point of sale or lease.  Additionally, Plaintiff and Class Members either have incurred or will incur economic damages at the point of repair in the form of the cost of repairs and/or the cost of vehicle repair from possible resulting collisions.

140.    Plaintiff and Class Members are entitled to legal and equitable relief against

---

[6] The Buick Enclave comes with a 4 year/50,000 mile bumper-to-bumper warranty.

Defendants, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

**RELIEF REQUESTED**

Plaintiff, on behalf of himself and all others similarly situated, requests the Court to enter judgment against Defendants as follows:

(a) An order certifying the proposed Class and California Sub-Classes, designating Plaintiff as named representative of the Class, and designating the undersigned counsel as Class Counsel;

(b) A declaration that Defendants are financially responsible for notifying all Class Members about the defective nature of the steering system, including the need for periodic maintenance;

(c) An order enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, and to remove and replace Plaintiff and Class Members' steering systems with a suitable alternative product;

(d) A declaration requiring Defendants to comply with the various provisions of the Song-Beverly Act alleged herein and to make all the required disclosures;

(e) A declaration requiring Defendants to comply with the various provisions of the Magnuson-Moss Warranty Act alleged herein and to make all the required disclosures;

(f) An award to Plaintiff and the Class for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

(g) Punitive damages, as allowable, in an amount determined by the Court or jury;

(h) Any and all remedies provided pursuant to the Song-Beverly Act, including California Civil Code § 1794;

(i) A declaration that Defendants must disgorge, for the benefit of the

Class, all or part of the ill-gotten profits they received from the sale or lease of its Class Vehicles, or make full restitution to Plaintiff and Class Members;

(j)     An award of attorneys' fees and costs, as allowed by law;

(k)     An award of all reasonable attorneys' fees and costs provided by statute, common law, or the Court's inherent power;

(l)     An award of pre-judgment and post-judgment interest, as provided by law; and

(m)     Such other relief as may be appropriate under the circumstances.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable.


Dated:  June 4, 2013                              Respectfully submitted,

Capstone Law APC

By: _____

Jordan L. Lurie
David L. Cheng
Tarek H. Zohdy
Cody R. Padgett
Sharon Yaacobi

Attorneys for Plaintiff Chris Aguilar

FIRST AMENDED CLASS ACTION COMPLAINT

# EXHIBIT A

1   Jordan L. Lurie (SBN 130013)
    Jordan.Lurie@capstonelawyers.com
2   David L. Cheng (SBN 240926)
    David.Cheng@capstonelawyers.com
3   Capstone Law APC
    1840 Century Park East, Suite 450
4   Los Angeles, California 90067
    Telephone:  (310) 556-4811
5   Facsimile:  (310) 943-0396

6   Attorneys for Plaintiff
    Chris Aguilar

7

8                   UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10

11  CHRIS AGUILAR, individually, and on        Case No:
    behalf of other members of the general
12  public similarly situated,                 **DECLARATION OF CHRIS AGUILAR IN
                                                SUPPORT OF PLAINTIFF'S SELECTION
13               Plaintiff,                     OF VENUE FOR TRIAL OF CLAIMS
                                                ARISING UNDER THE CALIFORNIA
14          vs.                                 CONSUMER LEGAL REMEDIES ACT**

15  GENERAL MOTORS LLC, a Delaware             [Cal. Civ. Code, § 1780, subd. (d)]
    Limited Liability Company; GENERAL
16  MOTORS COMPANY, a Delaware
    Corporation,
17
                 Defendants.
18

19

20

21

22

23

24

25

26

27

28

                                                EXHIBIT A Page 37

                DECL. OF CHRIS AGUILAR IN SUPPORT OF PLAINTIFF'S SELECTION OF VENUE FOR TRIAL

1

**DECLARATION OF CHRIS AGUILAR**

2

I, CHRIS AGUILAR, declare under penalty of perjury under the laws of the State of

3

California and the United States of America as follows:

4

1.       I make this declaration based upon my personal knowledge except as to those

5

matters stated herein that are based upon information and belief, which I believe to be true.

6

Unless the context indicates otherwise, I have personal knowledge of the facts stated in this

7

Declaration and if called as a witness, I could and would competently testify thereto.  I am

8

Plaintiff Chris Aguilar in the above-captioned matter.

9

2.       Pursuant to California Civil Code section 1780(d), this Declaration is submitted

10

in support of Plaintiff's Selection of Venue for the Trial of Plaintiff's Cause of Action

11

alleging violation of California's Consumer Legal Remedies Act.

12

3.       I purchased my 2010 Chevrolet Traverse, which is the vehicle at issue in this

13

action, in 2010, in Fresno, California, which is located in the Eastern District of California.

14

4.       On information and belief, Defendant General Motors Company is a Delaware

15

corporation.  Defendant General Motors Company owns 100% and is the parent corporation of

16

Defendant General Motors LLC.

17

5.       On information and belief, Defendant General Motors LLC is a limited liability

18

company organized and in existence under the laws of the State of Delaware, and registered

19

with the Delaware Division of Corporations to conduct business in California.  Defendant

20

General Motors Corporate Headquarters is located at 300 Renaissance Center, Detroit,

21

Michigan 48243.

22

6.       On information and belief, Defendants General Motors Company and General

23

Motors LLC (collectively, "Defendant" or "GM"), through their various entities, design,

24

manufacture, construct, assemble, market, distribute, and sell the 2009-2012 GMC Acadia,

25

2009-2012 Buick Enclave, or 2009-2012 Chevrolet Traverse vehicles at issue in Plaintiff's

26

Complaint filed concurrently herewith, in the Eastern District of California, Fresno County,

27

and throughout the United States of America.

28

7.       The transactions described above form the basis of this action or a substantial

1  portion thereof, and occurred in the County of Fresno.  To the best of my knowledge, based

2  upon information and belief, Defendant does business in Fresno, California, and advertises

3  and markets its products, including the products at issue in this complaint, in Fresno County,

4  California.  Accordingly, Fresno County is a proper place for trial of this action.

5      I declare under penalty of perjury under the laws of the State of California that the

6  forgoing is true and correct.  Executed this __th day of March, 2013 in Fresno, California.

7

8  Chris Aguilar

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT B



Capstone
LAW APC

1840 Century Park East, Suite 450
Los Angeles, California 90067
310.556.4811 Main | 310.943.0396 Fax

Cody R. Padgett
310.712.8029 Direct
Cody.Padgett@capstonelawyers.com

_____

March 20, 2013

**_Via Certified Mail, Return Receipt Requested_**
**_And First Class Mail_**

General Motors LLC
300 Renaissance CTR
Detroit, MI 48265
**Attn: Office of General Counsel**

General Motors LLC
Care of CSC Lawyers Incorporating Service
2730 Gateway Oaks Drive, Suite 100
Sacramento, CA 95833
**Attn: Office of General Counsel**

CLRA Letter Re:     GMC Acadia, Chevrolet Traverse, and Buick Enclave Vehicles
                    Equipped with Defective Steering Systems.

Dear Sir or Madam:

We are writing this letter on behalf of our client, Chris Aguilar, and all persons residing
in the United States who purchased or leased, not for resale, any 2009-2012 GMC
Acadia, Chevrolet Traverse, and Buick Enclave ("GM Vehicles").

Pursuant to the California Consumer Legal Remedies Act ("CLRA"), California Civil
Code section 1750 et seq., and specifically, sections 1782 (a)(1) and (2), we hereby notify
you that General Motors, LLC ("GM") has violated section 1770 of the CLRA by
warranting, advertising, and selling vehicles that it knew (or should have known) are
defective to thousands of consumers in California and throughout the United States.

In particular, we notify you that each of the GM Vehicles and their steering systems
suffer from numerous latent design and/or manufacturing defects. Because of a defect or
defects in the GM Vehicles and their steering pump, steering gear, column, intermediate
shaft, and rack and pinion, the GM Vehicles' steering systems are prone to sudden and
complete loss of power steering, poor steering reaction and/or loss of maneuverability
(the "Steering Defect").

The defectively designed and/or manufactured GM Vehicles and their steering systems present a safety hazard and are unreasonably dangerous to consumers. As the steering system malfunction progresses, this can lead to degradation of the rack and pinion, steering column, intermediate shaft and bushings. Among other problems, this malfunction can lead to reduced turning ability, leakage of oils and fluids, and damage to the vehicle alignment. These conditions can thereby contribute to traffic accidents, which can result in personal injury or death.

Our client, Chris Aguilar, is a California citizen who lives in Fresno, California, and a "consumer" as defined by California Civil Code § 1761(d). In or around May 7, 2010, Mr. Aguilar purchased a 2010 Chevrolet Traverse, and his vehicle has exhibited the Steering Defect described herein. Mr. Aguilar has suffered a loss as a result of the steering defect.

GM, through its own internal testing, records of customer complaints, dealership repair orders, as well as various other internal sources, was aware and knew of the Steering Defect. However, GM failed to disclose and actively concealed the Steering Defect from consumers at the time of purchase or lease and thereafter.

GM's conduct in warranting, advertising, and selling the GM Vehicles knowing that they contained multiple design and/or manufacturing defects constitutes the following violations of section 1770:

1. GM represented that the GM Vehicles had characteristics or benefits which they did not have (§ 1770 (a)(5));

2. GM has falsely represented that the GM Vehicles were of a particular standard, quality, or grade when they are of another (§ 1770 (a)(7));

3. GM advertised the GM Vehicles with the intent not to sell them as advertised (§ 1770 (a)(9));

4. GM represented that a transaction confers or involves rights, remedies, or obligations which it does not have-or involve (§ 1770 (a)(14)); and

5. GM represented that its goods have been supplied in accordance with a previous representation when they have not (§ 1770 (a)(16)).

Pursuant to section 1782 of the CLRA, based on the foregoing, we hereby demand that within thirty (30) days of receiving this letter, GM:

1. Notify all Class Members about the defective nature of the steering system, including the need for periodic maintenance;

2. Cease and desist from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, and remove and replace Plaintiff and Class Members' steering systems with a suitable alternative product;

EXHIBIT B Page 42

3.   Pay all costs of repairing or replacing the GM Vehicles owned or leased by any individual residing in the United States, so that the GM Vehicles will no longer suffer from the Steering Defect;

4.   Pay all costs of repairing or replacing any other parts of the GM Vehicles owned or leased by any individual residing in the United States that were damaged as a result of the Steering Defect;

5.   Reimburse any and all individuals residing in the United States who currently own or lease a GM Vehicle for all expenses already incurred due to the Steering Defect, including reimbursing all individuals for all their consequential and/or incidental damages;

6.   Reimburse any and all individuals residing in the United States who owned or leased a GM Vehicle all expenses incurred due to the Steering Defect including reimbursing all individuals for all their consequential and/or incidental damages; and,

7.   Provide monetary compensation, plus interest, to all owners and/or lessees of the GM Vehicles in the United States who have been damaged as a result of GM's conduct alleged herein.

Unless GM takes such action as demanded above within (30) days after your receipt of this letter, we intend to bring suit for damages pursuant to the CLRA on behalf of all owners and lessees of the GM Vehicles residing in California and throughout the United States.

If you have any questions regarding this notice and demand, please contact me at 310-556-4811.

Sincerely,

Cody R. Padgett

# Capstone
## LAW APC

1840 Century Park East, Suite 450
Los Angeles, California 90067
310.556.4811 Main | 310.943.0396 Fax

Cody R. Padgett
310.712.8029 Direct
Cody.Padgett@capstonelawyers.com

March 20, 2013

### *Via Certified Mail, Return Receipt Requested*
### *And First Class Mail*

General Motors Company
30600 Telegraph Road STE 2345
Bingham Farms, MI 48025
**Attn: Office of General Counsel**

General Motors Company
Care of Hedrick's Chevrolet
961 W. Shaw Avenue
Clovis, CA 93612
**Attn: Office of General Counsel**

CLRA Letter Re:   GMC Acadia, Chevrolet Traverse, and Buick Enclave Vehicles
                          Equipped with Defective Steering Systems.

Dear Sir or Madam:

We are writing this letter on behalf of our client, Chris Aguilar, and all persons residing in the United States who purchased or leased, not for resale, any 2009-2012 GMC Acadia, Chevrolet Traverse, and Buick Enclave ("GM Vehicles").

Pursuant to the California Consumer Legal Remedies Act ("CLRA"), California Civil Code section 1750 et seq., and specifically, sections 1782 (a)(1) and (2), we hereby notify you that General Motors Company ("GM") has violated section 1770 of the CLRA by warranting, advertising, and selling vehicles that it knew (or should have known) are defective to thousands of consumers in California and throughout the United States.

In particular, we notify you that each of the GM Vehicles and their steering systems suffer from numerous latent design and/or manufacturing defects. Because of a defect or defects in the GM Vehicles and their steering pump, steering gear, column, intermediate shaft, and rack and pinion, the GM Vehicles' steering systems are prone to sudden and complete loss of power steering, poor steering reaction and/or loss of maneuverability (the "Steering Defect").

The defectively designed and/or manufactured GM Vehicles and their steering systems present a safety hazard and are unreasonably dangerous to consumers. As the steering system malfunction progresses, this can lead to degradation of the rack and pinion, steering column, intermediate shaft and bushings. Among other problems, this malfunction can lead to reduced turning ability, leakage of oils and fluids, and damage to the vehicle alignment. These conditions can thereby contribute to traffic accidents, which can result in personal injury or death.

Our client, Chris Aguilar, is a California citizen who lives in Fresno, California, and a "consumer" as defined by California Civil Code § 1761(d). In or around May 7, 2010, Mr. Aguilar purchased a 2010 Chevrolet Traverse, and his vehicle has exhibited the Steering Defect described herein. Mr. Aguilar has suffered a loss as a result of the steering defect.

GM, through its own internal testing, records of customer complaints, dealership repair orders, as well as various other internal sources, was aware and knew of the Steering Defect. However, GM failed to disclose and actively concealed the Steering Defect from consumers at the time of purchase or lease and thereafter.

GM's conduct in warranting, advertising, and selling the GM Vehicles knowing that they contained multiple design and/or manufacturing defects constitutes the following violations of section 1770:

1. GM represented that the GM Vehicles had characteristics or benefits which they did not have (§ 1770 (a)(5));

2. GM has falsely represented that the GM Vehicles were of a particular standard, quality, or grade when they are of another (§ 1770 (a)(7));

3. GM advertised the GM Vehicles with the intent not to sell them as advertised (§ 1770 (a)(9));

4. GM represented that a transaction confers or involves rights, remedies, or obligations which it does not have-or involve (§ 1770 (a)(14)); and

5. GM represented that its goods have been supplied in accordance with a previous representation when they have not (§ 1770 (a)(16)).

Pursuant to section 1782 of the CLRA, based on the foregoing, we hereby demand that within thirty (30) days of receiving this letter, GM:

1. Notify all Class Members about the defective nature of the steering system, including the need for periodic maintenance;

2. Cease and desist from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, and remove and replace Plaintiff and Class Members' steering systems with a suitable alternative product;

EXHIBIT B Page 45

3.  Pay all costs of repairing or replacing the GM Vehicles owned or leased by any individual residing in the United States, so that the GM Vehicles will no longer suffer from the Steering Defect;

4.  Pay all costs of repairing or replacing any other parts of the GM Vehicles owned or leased by any individual residing in the United States that were damaged as a result of the Steering Defect;

5.  Reimburse any and all individuals residing in the United States who currently own or lease a GM Vehicle for all expenses already incurred due to the Steering Defect, including reimbursing all individuals for all their consequential and/or incidental damages;

6.  Reimburse any and all individuals residing in the United States who owned or leased a GM Vehicle all expenses incurred due to the Steering Defect including reimbursing all individuals for all their consequential and/or incidental damages; and

7.  Provide monetary compensation, plus interest, to all owners and/or lessees of the GM Vehicles in the United States who have been damaged as a result of GM's conduct alleged herein.

Unless GM takes such action as demanded above within (30) days after your receipt of this letter, we intend to bring suit for damages pursuant to the CLRA on behalf of all owners and lessees of the GM Vehicles residing in California and throughout the United States.

If you have any questions regarding this notice and demand, please contact me at 310-556-4811.

Sincerely,

Cody R. Padgett